who has joined us for this case. Pit River Tribe v. Bureau of Land Management, when we three judges could be together. So, when you're ready. May it please the Court, Mary Gabrielle Sprague for the Bureau of Land Management, and I would like to reserve eight minutes for rebuttal, please. Well, can you keep your eye on the clock and we'll try to help. Will do, Your Honor. Geothermal reservoirs may underlie multiple leases, and geothermal steam can be produced from a reservoir without drilling a well on each lease. Unitization is used to efficiently produce the resource. Under the unitization principle, work or production anywhere in the unit is attributed to all leases in the unit. All leases that overlie the reservoir are entitled to share in the revenues from production from that reservoir, whether or not a well is drilled on the surface of each lease. As an effect, in 1998, Section 1005 of the Geothermal Steam Act provided for a primary term of 10 years, five-year extensions in certain circumstances when production was not achieved during the primary term, and then a continuation of up to 40 years when production was achieved. Now, you've used the word extension rather than the word continuation in reference to, I believe, 105 subsection A. In oil and gas law, is there a distinction between continuation and extension? Your Honor, if I said extension, I misspoke with respect to... Okay, well, irrespective of what you said, is there a distinction in oil and gas law, and of course, which might have been carried over here... Right. ...between continuation and extension? Yes. The idea of continuation is for production to hold the lease in effect to produce the lease, and extension is used for extending the lease to continue exploration in order to achieve production. There is some looseness in... It's not consistent, is it? The MLA doesn't use that term consistently. For example, in 226, it's not consistent because just when I thought I'd figured out that continuation means, you know, that it's based on production, and I think it pretty much is in the GSA. Not pretty much. I think it's consistent. But it's not in the MLA. Would you agree with that? You know what, Your Honor, I would have to... Would you like me to take a look? I don't have a basis for... You don't have to. No, I'm looking at it. Okay, disagreeing. But I think generally, for purposes of this argument, and I shouldn't have cut off Judge Fletcher's question because I'm very interested in the answer, is that how you're using continuation, that it's keyed to and triggered by production as opposed to extension? That's correct, Your Honor, although I will say in terms of even in the regulations and certainly in decisions discussing the Geothermal Steam Act that the terms are somewhat used interchangeably. Right. The reason I ask the question, and it's teed off a decision by the Department of Interior, but that cites other things, but it says to me that a lease may be extended beyond its primary term in one of two ways. First is continuation by production. That's in quotation. Second, extension by drilling. That's in quotation. Right. And as I read now the Geothermal Steam Act and as I read Sections 105, Sub-A and Sub-B, that looks like continuation by production. And as I read Sub-C and Sub-G-1, that looks like extension by drilling. Correct. Am I reading those sections properly? Correct. Okay. Got it. Yes, and as I say, there is imprecision even in BLM's own regulations. Right. But I'm trying to figure out those sections. Yes. And those sections are continuation by production, Sub-A, Sub-B, extension by drilling, C and G-1. Yes. Okay. Okay. And so your big problem, of course, is that Subsection A, 1005A, doesn't say that, doesn't talk about the unitization principle, and that's very expressly baked into other parts of the statute. And can you just go straight to it, please, because that's going to take all 20 minutes, I think. That's the issue for me. Right. So, Your Honor, I believe that you need to read the provisions as a whole and that the inference from not having the word unit plan in 1005A is not that the unitization principle does not apply. There doesn't have to be an express reference when you read 1005A in conjunction with 1017 that incorporates the unitization principle into the statute as a whole. Well, that's your conclusion, of course. That's your conclusion. But, you know, I struggle with it because, of course, it takes a lot to get us to do something contrary to the express language of the statute. And you know the canons that talk about G. Sure, Your Honor. They use that very language in other parts of the statute. So we've got that tension and we've got many pages of briefing about that now. And the MLA, I thought your background section in your brief was very helpful to explain the unitization principle, and I'm sure we all appreciated that. But the MLA bakes in this notion of continuation on a unit-wise basis during the primary term in Section 226, and you don't have that here. So what's your strongest argument? Is it the anomaly or the inconsistency that production will be rewarded on a unit-wide basis everywhere else in the GSA and not in Section A? Right. Your Honor, yes. And the unitization is so fundamental that if you don't read it into 1005A, many provisions don't make sense. I would also jump to 1005A. Before you, because that's your strongest, you posed the question, why would Congress have done that? Why would they award production everywhere else but the primary term? And so can I just ---- One possibility is they wanted to encourage exploration during the primary term. And I understand there's tension with the unitization principle, but, you know, we are not geothermal experts, engineers. And so we don't really know that steam reacts the very same way as oil and gas, and we're working with what we've got here. I don't know why Congress would have done that. But I can think of some reasons that that primary term might have been treated differently, and your brief doesn't seem to grapple with those. Well, the point of exploration is to get to production. And once you drill a well that is able to produce, then that triggers the next stage, which is the development of the lease, and you start to focus in on how to effectively develop a power plant to utilize that steam. Right. And so you don't do the kind of exploratory drilling through the entire unit that you do until you hit that well. Then you focus on that well. Well, you know, I appreciate that, but let me just play devil's advocate because we're grappling with the express language of the statute here. And one reason perhaps to treat the initial 10-year term differently would be to avoid this very situation where there's one well capable of production, you know, one lease, and then the whole unit is tied up for many, many years. That's clearly what was concerning the district court. Right. And actually it was concerning Mr. Haggerty in 1998. Correct. So do you want to speak to that? Sure. So there are other mechanisms that were designed to deal with that. One of them in 1988 when Congress made the capable of production concept without a definite 5-year end date, it also added the 5-year review provision to 1017. To constrict. To constrict if necessary. Right. Can you explain how that works? Every five years the BLM is supposed to, it didn't happen exactly on schedule in this case, obviously. Even close. Correct. that you analyze whatever new data you have, and if that data indicates that the resource is not efficiently managed with the current boundaries, then BLM issues a decision to reduce the unit. Okay, and it talks about constricting the area plan. And then what happens to the leases that are outside the constricted area? Then they are on their own. So if a unit review shrinks the unit, then the leases or the parts of the leases that are outside are on their own. So they would then have to apply for an extension. On their own meaning, and they're not subject to the unitization principle. Correct. So they don't benefit from drilling on other parts of the unit? Correct. Yes. Another mechanism is when a well is drilled is the participating area concept. And so that is the time when you focus in on the well. You're in the process of developing a power plant. And the participating area is not necessarily smaller than the unit, but often is. And only the people who, based on the information at that point in time, the leases that overlie that specific reservoir that's going to be produced share in the revenues. So I think that was the source of the confusion to Mr. Haggerty, because Article 12 of the Model Unit Agreement, which was incorporated into the unit agreement for the Glass Mountain unit, talks about forming a participating area before production. And ordinarily, without the capable well, if you're actually ready to go into production, you need to make sure that the right people are getting the revenues. And so that was the confusion about, well, does this get triggered when it's a capable well? Because we're still some period of time away from generating revenue. Well, a capable well is sort of giving some slack because this is new, this is steam, this isn't oil. They've expanded the definition of production is what they've done. But I've got a slightly different question. I think I'm right that the BLM has changed its interpretation of the statute, and that the interpretation that's now advancing is an about face. That is to say, I think its earlier interpretation of subsection A is what the plaintiffs are arguing for. Am I wrong? Your Honor, there was a period of confusion in the California State Office. I don't want to say confusion. I want to say I think they had it interpreted the opposite way, and they switched. So I'm not sure I want to call that confusion. They interpreted it one way, which is what the plaintiffs are arguing for. And now the government has changed its own interpretation. How come? Well, it's not the government, Your Honor. It's the California State Office. The regulation. Wait a minute. Hold on. There's the Nevada office, right? The Nevada office and the California office did not agree. That's what Judge Fletcher is referring to. Correct. I'm sure we're talking about the same episode. And they flipped, and those are the Sean Haggerty memos, right? Right. Is that a yes? Yes, Your Honor. Okay. But the definitive statement of the Department of the Interior are the regulations. And the regulations have always provided for the unitization principle for production without regard to primary term or later term. Counsel, it's tricky, and forgive my candor here, and I don't mean to be disparaging, but, you know, you're asking for, the government's asking for deference here. And I read the record, and I want to give you every opportunity to correct me. I do read the record as the government did a 180 on its own interpretation, and now it's asking for deference. Am I, in fairness, am I missing something there? We're asking for deference to the regulations, Your Honor, which haven't changed. And your interpretation, but not you. The government's interpretation did do what Judge Fletcher is describing, didn't it? Didn't it do a 180? The California State Office did, yes. Okay. The regulations did not. And did any other office of the federal government with jurisdiction over this area say otherwise when the California State Office was doing this? I don't believe that it had been this issue of interpreting the capable well in the context of when you form a participating area. I don't know that it was before any other office. Well is just an expanded definition of producing. Correct. So a capable well really just tells me continuation by production. Correct. But going back to this, I think for me this was key, and I want to make sure I'm understanding it. I read those memos from Mr. Haggerty as saying I don't have any way to manage this field because BLM hasn't required the proposed participating area from Calpine. So the field had not been constricted. Am I misunderstanding that? That was his concern. Right. So he was reading this as an all or nothing. If we don't have constriction, then all of A, there's a unitized principle that is going to tie up all of it for up to 50 years because you're not constricting. You're not requiring constriction.  That was his concern, yes. All right. But he neglected to look at 43 CFR 3203.1-5 BNC, which has been part of the regulations from the beginning and provided that when you segregate leases, when you constrict a unit plan, the leases outside the unit area then have to stand on their own, which means that the leases inside the unit area continue by virtue of the production or work within the unit. And that was part of the regulation. So the leases inside the participating area, the shrinking constricting participating area, continue to benefit from the unitization concept, but the others, where the lease terms haven't expired but they're sort of kicked out of the participating area, are going to have to qualify on a lease-by-lease basis? They have five years where it's still treated as a unit. So there's a difference between what happens when you form a participating area and when you actually constrict the unit boundaries. So when you form a participating area, then the leases within the unit but outside the participating area continue to exist for five years, and they continue to get the benefit of the production continuation, although there are then drilling requirements in order to hold those leases. For five years? For five years. Pardon me for interrupting, but our time is running. It seems to me that you're fighting the plain language of the statute, and the best way that you're fighting or the best way you have to fight is to say that the plain meaning doesn't work as a practical matter. Am I misunderstanding you? Your Honor, I would disagree with you because we would say that 1005A doesn't expressly include the unitization principle but it doesn't expressly exclude it. Oh, my goodness. Because C and G1 expressly include it and it's not there, I just have to say an ordinary plain language reading of the statute says if it's expressly stated in C and G1 and the words are absolutely absent from A and from B, plain language says it's not there. So you've got to convince me somehow that this reading doesn't make practical sense. But let me give you a suggestion as to why it makes practical sense and then you can tell me why I'm wrong. For A and B, where you have continuation by production, as soon as the lease is productive, then it's fine so long as it continues to be productive. If the lease is not producing, then you get a continuation on a unit-wide basis by drilling and we're talking largely about exploratory drilling and because we're talking about exploration, it may be inefficient to require an order for extension by drilling that there be drilling on every lease. So as to avoid the inefficiency of simultaneous exploratory drilling throughout the unit, you have unitization when it's extension by drilling, which gives me then a pretty good explanation for the differentiation. Why am I wrong? I think that works, Your Honor. But I want to get back to one thing. Then the statute does work. Wait. This is a very important point. Why is that wrong? Please. I think you just said it wasn't wrong. Your Honor, I'm sorry. My point earlier was that I think your strongest argument, and you agreed with this, is that it would be anomalous to only reward throughout the rest of the statute to reward continuation based on production, right? Judge Fletcher has just given you a different alternative that makes sense, I think, and I'm wanting you to respond to that. I'm sorry. Do you want me to give it to you again? Yeah, I'm sorry, Your Honor, to make you do that again. I apologize. Here we go again. Just blame it on Congress. It's a tough statute. Okay. We're taking you over, but we'll make sure both sides get a chance to say everything they need to say. Okay. Here's how I read the statute as making sense. We have continuation by production in subsection A and B. If a well is producing, we allow the well to have its continuation of the lease for 40 years and then another 40 years, at least with first right of refusal or preference. So when you say a well is producing, do you mean that lease? No. Excuse me. I shouldn't say well. I said that lease is producing. That was my mistake. That one lease. The one lease is producing. I see. Okay. That's where I got off. Sorry. And so long as the lease is producing, you get extensions. Excuse me. You get a continuation under subsection A and then a right to renewal under B. On the other hand, if the lease is not producing, the only way you can get sort of a longer lease, I'll stay away from the word extension and continuation, is by extension. And you can get the extension by continuing to drill. Now, drilling is exploratory drilling for the most part, and if you have an entire unit that looks as though it may be capable of producing steam but out of a common pool, it may be very inefficient to require that each lease, in order to maintain its validity, do simultaneous drilling. Therefore, we have a unitization process for extension by drilling. Each lease, if it's extension by drilling, gets an extension so long as there is one lease in the unit that's doing active drilling, which makes perfect sense to me. Does it make sense to you? Right. Okay. The answer is no because that's inconsistent with the language of 1000G. I'm sorry. I don't want inconsistency with the language. I'm now talking practicality. Does that make sense as a practical matter? It doesn't, Your Honor, because when you categorize a lease without a well drilled on the surface as non-producing, that's just because we see the surface, but the reservoir is underneath. And when that well on one lease is pulling steam, it's pulling steam potentially from under these other leases. Of course. So the steam is being produced from that lease because our legal framework is, if you own this surface, you own the steam under it. It's just we can't see it. So the concept that those other leases aren't actually producing because they don't have the straw poked in them, I think is the problem with that scenario. That's exactly the way it reads, though. It's as if you have under A and B, you have a producing lease. And in this case, we had 27. So we have one of the 27. That leaves 26. And then if it's unitization, and it may have been in the first place where it was unified and you ended up with one producing lease, then you have 10 years with respect to the other 26 leases to drill. And that's all you have to do is drill, even if it's the day before the end of that 10 years. Now, it may be, that's the way I read the statute, and it may well be that that makes no sense in this type of energy, geothermal energy. And maybe that was the purpose in the beginning, and that's why it reads the way it does. There's been some changes. I think there's a continuation of Justice Silver's point. If we've got a producing lease, and I've got the adjoining lease, and it's not now producing, and I'm worried that the producing lease is sucking steam that is on my lease, all I need to do is drill. And I've got a fairly long period to do it in order to protect myself. But there's no necessity practically to have everyone drilling when the focus needs to be on the well and developing the plant and developing the participating area. But all you need is to, if the company decides this is profitable, we got the 27 leases in the first place, we have one producing lease, so we have to decide in 10 years whether any of those other leases, the 26, are going to be profitable. And we better do it in 10 years or we walk away. So we have to decide scientifically if we should drill one day before that 10 years is up, because we're going to be able, in addition to the producing lease, we're going to be able to produce another one. But that's going to be up to the company. I mean, it's not just BLM. Your Honor, if I could just say, these, the leases don't necessarily, they can't get extensions under 1005G1 because that says that you're only eligible for a 1005G1 extension if you have not produced steam in the unit during the primary term or during the extension, a drilling extension under 1005C. So 1005G1, that language supports our interpretation by saying that you can get a production continuation under 1005A during the primary term. And if you do, then you can't get an extension because you don't need one because you've already gotten a production continuation. Okay. Why don't we do this? You're three minutes over. Let's hear from the other side. Okay, Your Honor. But we'll make sure to give you a chance to respond. Thank you, Your Honor. Okay. Good morning, Your Honors, and may it please the Court. I am Samuel Lazarowitz, appearing for the plaintiffs in this case alongside my co-counsel, Mr. Caleb Wright. I will be speaking for about 12 minutes addressing Section 1005's plain text and statutory framework, while my co-counsel will speak for about eight minutes addressing the government's central arguments. Excuse me. Could you start the clock? Okay. Addressing the government's central arguments, namely that this Court should depart from 1005A's plain text due to provisions in Section 1017 of the Geothermal Steam Act and similar provisions in the Mineral Leasing Act. Okay. Turning to my argument, BLM lacked statutory authority when it granted Glass Mountain Units 26 nonproductive leases additional terms of up to 40 years. 1005's plain text makes this clear. To resolve this case, this Court does not need to look farther than the statutory text. 1005A provides, if geothermal steam is produced or utilized in commercial quantities, such lease shall continue into an additional term. And the key language in 1005A is such lease. By using such lease, Congress made clear that only a lease that was producing, that had a capable well or a productive well, would qualify for an additional term. What is the answer to opposing counsel's question where she says, why would it make any sense for Congress to reward production with continuations throughout the rest of the Geothermal Steam Act but not in subsection A during the primary term? What's the answer? The answer to that, Your Honor, is that the other additional term provisions in Section 1005 are read consistently with the one in 1005A. That all, that all, that. Well, they're not if we read it your way. Because every other place in the GSA rewards actual production with continuation. Yes. But not in the primary term? Well, the 1005A does reward production. Not on a unitized basis, it doesn't. And that's the argument you're advancing. So my question is, her question, really, that she poses in her brief, and I don't think your brief answer is, why would Congress have done that, on a unitized basis throughout the rest of the GSA during extension periods but not within the primary term? Our position is that Congress was consistent and only allowed additional terms on a lease-by-lease basis in all of 1005's additional term provisions. So we believe that C and G2 are read consistently. Our position is that C and G2 are read consistently with A. Wait, wait, wait. Is your position that C doesn't allow continuations on a unitized basis? We believe the best – our position is the best reading of C is that the extensions are available on a unitized basis. So when you do engage in these – The council asked a really specific question. It would just help me out if you'd answer it. Absolutely. Our position is the best reading of C is that C's additional term language only applies on a lease-by-lease basis. And that's – Wait a minute. I'm not sure. You're telling me that C, which is extension by drilling, is lease-by-lease? No, Your Honor. Not the extension aspect of C. So those five-year extensions for drilling operations undertaken within the unit are available on a unit-wide basis. So any – as long as we have drilling operations being diligently prosecuted at the end of the primary term, those five-year extensions can be available on a unit-wide basis. On a unit-wide basis. So all you need is one. Yes. Before the end of the 10 years. For C, absolutely. But your – I mean, if you can get to the question, please. Is it your position that actual production under C is not going to result in a continuation on a unitized basis? We – our position is that's the best reading of C. That would be to read those – would read all those additional – all those continuation or additional term provisions consistently. As 1005G2, again, 1005G's additional term provision, adopts the same – 1 or G2? G2. And so you read the continuations in G2 on a unitized basis? On a – we believe on a lease-by-lease basis. How do you get there? G1 incorporates – G2 incorporates G1, counsel. And G1 is definitely unitized. So G1 – Expressly. G1 is expressly unitized, but the phrasing of the – the phrasing of the statute makes clear that what we think about is the individual lease and how the unit activities can qualify that lease for an extension. So we see that in G1's language where it starts any geothermal lease. And so we see that it's thinking about individual leases and how those unit activities can qualify for them for the extension. And then when we turn to G2, it says, a lease extended pursuant to paragraph 1. So we're still thinking about the – we're still thinking about individual leases and whether or not those unit-wide activities can qualify those leases individually for extensions. The extensions are given to all leases within a unit, but still on – but still on sort of a lease-by-lease basis in that sense. And there we see that G2's continuation provision, it similarly applies on a lease-by-lease basis. And that's exactly how BLM has interpreted 1005A, 1005C, and 1005G2 in its own regulations. And these regulations have remained consistent since the passage of the Geothermal Steam Act – the Geothermal Steam Act amendments. If we turn to 3203.1-3, we see that all of the – are extended – are granted additional terms in the same way and treated under the same regulation. If we turn to the text, if geothermal resources are produced or utilized in commercial quantities within the primary term or any extended term of a lease, that lease shall continue, end quote, into an additional term. So we see there's a consistent approach of a lease by – in BLM's own implementing regulations, that additional terms are only available to individually productive leases. And why does that make sense? Why do you believe that Congress meant that to occur at the time? We believe that made sense, Your Honor, because Congress was creating a leasing framework for a relatively untried and untested industry. What it wanted to do – it had two goals when it created the Geothermal Steam Act. It wanted to encourage and incentivize exploration and production, yet at the same time, it wanted to make sure that federal public lands not necessary for production would be returned to multiple use. And we see that in 1005's structure. Congress made – Congress authorized leasing in areas that showed some geological signs of heat, but no one – They authorized it through the BLM. Yes. Yes, Your Honor. They authorized it through the BLM to allow leasing units to be formed in known geothermal resource areas, but no one knew where these – where commercially developable resources were in these areas or within these units. And so Congress did two things in the – in 1005. It allowed unit-wide extensions to be available under 1005C and 1005G1, and as long as the conditions are met, that's up to 15 years of extensions on top of a 10-year primary term, giving lessees a plenty amount of time to explore these units to see if they could find commercially – Within 10 years. So they have one production, like we have in this case, but they had to determine whether or not in that unit of 26, whether or not it made any sense to continue. And that would be by drilling under C, right? Yes, Your Honor. So Congress, in 1908, when it added G – 1005G, would allow extensions under two avenues, one through actual drilling, the other through diligent exploration efforts, which can be exploratory drilling but also some lesser testing activities. As I read that, it's in a way analogous to the capable well provision for A, where you don't really need a producing well. Here, you don't really need drilling. You can have bona fide effort, both of them trying to give a little bit of a break to the leaseholders. Yes, absolutely, Your Honor. So that's the second thing, that Congress loosened the definition of production, allowing a well that was merely capable of production to qualify a lease. And in a sense, it loosens the definition of drilling to allow whatever constitutes bona fide effort under the definition. So in loosening up that, Congress also constrained how 1005 would work to make sure that thousands of acres of federal public lands couldn't be tied down for decades without demonstrating that the lands had this commercial potential. But what about the – it's an argument that I think Pitt River waved earlier, that the other thing Congress was doing that seems to have been set aside because of the way of the argument. But when I read this as a whole, it includes the concept of constricting the participating plan area. And you heard opposing counsel's response to that. Do you agree with her about the way that works to constrict the area? So the participating area in a creation of BLM's regulations does work to constrict how – And just to be specific because your time is ticking, once it constricts and leases are then – outside the participating area, she said they get a five-year, basically a grandfather period, where they get to benefit from the unitization principle. And then they don't. They have to qualify on their own. Is that right? Yes. So under the regulations, the initial participating area is supposed to be formed as soon as the first well is drilled. And that's usually just for the lease. The initial participating area is usually just the lease that has the capable well or producing well on it. So the regs, I think, say this happens every five years. The primary term is 10 years. Should that process have happened at year five? Oh, so the 1017 five-year review, Your Honor? So I would have to look at the text of 1017's five-year review to see if it should have. That's okay. If you don't know, that's fine. Sorry. I'm just trying to figure out how both parts of this statute work together. And it seems to me that there was a real concern throughout this that the problem with continuations under 1005A for up to 40 years was going to allow a whole lot of public land to be tied up for a very long time. And basically this very situation where one well was deemed capable of producing and a whole lot of land has been tied up for a very long time, and I'm trying to figure out if BLM had gone forward and required the participating area to have been constricted like it was supposed to but did not, would that be an answer to the concern? That would be one possible way to deal with the unit. But Congress created Section 1005 to deal with this very situation by making sure that only that additional terms, that 40-year period, were only available to leases that had already demonstrated their commercial potential, to make sure that leases that had proven that they had a reason to perpetuate could exist, and making sure that those five-year extensions were available to other leases within units so the lessee could have time to see if those leases could similarly produce. And this all makes sense because geothermal energy requires several wells in order for it to be a profitable exercise. In contrast to oil and gas. Yes, in contrast to oil and gas. As we see at the telephone flat proposal for a similar part of the Glass Mountain Highlands, they proposed drilling 10 to 12 production wells and 3 to 5 injection wells to power a 40-megawatt power plant. And it's this key idea in the practicality of geothermal steam that we can keep in mind, and so 1005 makes sense. Okay. Thank you, Your Honor. If you could put eight minutes on the clock, because that's what they sought to preserve and we took them over by a bit. Thank you. Thank you. Good morning, Your Honors. Caleb Wright for the plaintiffs. There's no reason to depart from Section 1005A's plain text, but Department of Justice looks to 1017 and the Mineral Leasing Act to read unit into 1005A. But there's nothing in 1017, the implementing regulations, or the model unit agreement that would support departure from an interpretation where additional terms operate on a lease-by-lease basis. I'm going to address three arguments in turn. First, Department of Justice claims that the unit provisions in the Mineral Leasing Act and the Geothermal Steam Act operate in exactly the same way. And while the unit provision 1017 is an important aspect of the Geothermal Steam Act, it differs in a significant way from the Mineral Leasing Act. Congress in 226J in the Mineral Leasing Act expressly provided that units can affect lease terms. They said that any lease that's become the subject of a unit plan, quote, shall continue in force until the termination of such plan. So by virtue of being in a productive unit in the Mineral Leasing Act, lease terms can continue. Meanwhile, Congress in 1017, the analogous unit provision in the Geothermal Steam Act, did provide the authority to manage units, but it didn't provide that being in a unit would affect a geothermal lease term. So instead, in the Geothermal Steam Act, the only provisions that can affect a lease term are found in 1005. And in 1005, the provision that governs additional terms, 1005A, doesn't mention units at all. And this is reflected, this difference between the Geothermal Steam Act and the Mineral Leasing Act is reflected in the model unit agreements in both statutes. First, the model unit- Congress didn't have the model units, right? The model unit agreements, those were, the agency came up with those later, right? Correct, Your Honor. GSA was promulgated? Okay. Correct, Your Honor. They're a part of, in the Geothermal Steam Act, they're a part of subpart 3280, which implements 1017. And the model unit agreement confirms that lease terms are subject to the provisions in the Geothermal Steam Act. Article 17.7 of the model unit agreement in the Geothermal Steam Act states that any federal lease committed herein may be continued for a term so provided therein or as extended by law. So it can't continue beyond, and it's subject to the lease term provisions that are in the GSA. However, in the Mineral Leasing Act, the analogous provision there, 18E, says that any federal lease shall continue in force beyond the term provided therein until the termination hereof. So, again, the reflection, or the Geothermal Steam Act and the Mineral Leasing Act differ in significant, in that significant aspect, and that's reflected in the model unit agreements. The second argument that I'd like to address that DOJ asserts is that our reading of 17.4 of the model unit agreement would mean that geothermal units provide no benefits. But as we've seen, the model unit agreement is subject to the Geothermal Steam Act in Article 17.7. And additionally, their reading of 17.4 reads it in isolation. And so 17.4 can't be understood in a vacuum because it doesn't explain what benefits are. You have to look elsewhere within the model unit agreement, and we see that there are benefits within the model unit agreement. For example, Article 13.2 stipulates that one of the benefits is that you can share in the profits of all wells. Article 9.1 states that you can share in the costs incurred for conducting unit operations. And then most importantly, Article 17.3 says that a benefit of unit agreements is that they enable unit activities to satisfy diligence requirements on the unit. So we can see that in the model unit agreement that a unit facilitates the coordinated and efficient exploration and incentivizes activities that are necessary for the actual production of geothermal energy. The final Department of Justice argument that I'd like to address is their contention that geothermal energy has a rule of capture problem, which would require us to read unit into 1005A because it operates in a similar fashion as oil and gas. But that is a fundamental misapprehension of the difference between geothermal energy and oil and gas. Geothermal energy can't be exploited with a single well. Why do we have that in the record? This is why you want us to be geothermal engineers, it seems to me.  No, Your Honor, as my co-counsel stated, there was a proposal for the telephone flat that had multiple wells, and you can see it in the geysers, for example, but there's nothing further in the record that would indicate that. We are just struggling with the language of a statute here. We're just judges, and that's what I'm really focused on. For my part, I see an anomaly in the statute. It makes sense to me that the unitization principle sort of modeled off the MLA, although loosely it's not verbatim for sure, and I read 226J the way you do. It's baked in. The unitization principle is baked in there for the primary term continuation. We don't have that in the Geothermal Steam Act. But I'm trying to figure out why they would have treated the primary term differently, and maybe we don't get to know that and we're left with the plain language, but are there reasons to treat the primary term differently in the GSA? In Part A, I should say, to be fair, so that's the one that doesn't reward production with a continuation, and I read, I'll just tell you, contrary to your compatriot, I read subsection C and subsection G as quite clearly granting continuations on a unitized basis. Yes, Your Honor. To your question on why additional term might not or the unit might not be baked into additional term, I think, as my co-counsel explained, and this might not be satisfactory, but we believe that the important thing is to produce geothermal energy once a well is drilled, and that requires extensive on-site activities that will lead to production. So in this regard, to liberalize the definition of what qualifies as production would allow the ability to gain that organization and the ability to get that on-site efforts that will eventually lead to production. And for this reason, though, Congress limited 1005A just to individual leases, because there's plenty of time available in the other extensions. There is the primary term, and then these leases that exist within units can then still qualify for extensions under either C or G1, which would be a total of 15. Let me ask you this, and I'm sure you heard the argument I was asking the government as to, well, why doesn't it make sense because of the following reason. If you've got a producing lease, that just gets to continue. If you don't have a producing lease, you get an extension if you're actively drilling or you're making bona fide efforts. And the reason for treating them differently is that you don't want to require for a continuation of exploratory activity that there be active drilling on every lease. And the government at first said, maybe because she didn't understand me, that makes perfect sense, or at least that makes sense. And then after I repeated it, it said, well, no, that doesn't make sense because, and the because as I heard it was, well, if you have a producing lease, that means it will be, she didn't use this word, but sucking steam out of adjoining leases, and therefore you want to treat a producing lease as part of a unit rather than as a single unit, rather than a single lease. What's your response to that? Yes, Your Honor. Well, the model unit agreement does provide for profit sharing as an initial matter, so it's not like these other leases that are not producing won't be able to share in the profits, so long as they continue to be part of the participating area. So even if there's only one lease that's producing and the next lease is not producing, the non-producing lease is entitled to profit sharing? Yes, Your Honor, unless it's contracted out of the unit through the participating area mechanism. So long as it's in the unit, it gets profit sharing even though it's not producing. I'm hearing there's some shaking of the head over there, and when you get there, you can tell me why you disagree. Okay. And, Your Honor, to your other point, geothermal heat is essentially hot rocks, so it's not this idea where you can just suck up the heat out from adjoining leaseholders. You can't just drill from one end of the range to suck out from the other, and I know that that's not real. Like with oil and gas. Yes, Your Honor. And so that's another reason why you don't have this frantic overcompetition that you had in oil and gas, and geothermal steam is. So you're not sucking steam. You, to some degree, are cooling off your own rocks on your own lease, and that may or may not be cooling off the rocks in the adjoining lease. Yes, Your Honor. And if there are no further questions. That may be the answer, then, that the analogy to oil and gas doesn't follow because you're not sucking steam. You're just putting steam down and get it heated up on your own hot rocks, and that comes back up again as geothermal steam. Yes, Your Honor. Do we have that anywhere? I'm not trying to be a pill. I have looked for how I'm supposed to know whether the GSA, whether this resource acts the same way as the MLA. Is there something in the record that I've missed? No, Your Honor. Okay. So we just look, are we back to then just looking at the language and trying to, is that your point then, look at the express language of it? Yes, Your Honor, exactly. There's no compelling reason either in the record or in the Mineral Leasing Act or 1017 or the Geothermal Steam Act writ large that would compel a departure from that plain text interpretation. Okay. Let me ask you one thing that your counsel said about that with geothermal leases, it makes a lot more sense in terms of energy to have one or more going at the same time, right? Yes, Your Honor. As opposed to oil and grass. So is this case an oddity? You only had one that was producing and then that's the end of it. Well, it was capable of producing. That was capable of producing. We had one that was capable of producing, but the other 26. Yes, Your Honor. The other 26 had no capable of production determination that was ever made. Okay. And if there are no further questions, Your Honor, the district court correctly found that additional terms operate on a lease-by-lease basis and affirming that determination will remand back to the agency and will give BLM for the first time the opportunity to consult with our clients over these tens of thousands of acres of land that is of such profound spiritual and aesthetic importance. Thank you. Thank you very much. Could you put three minutes on the clock, please? Your Honor, just a few points. An initial participating area is not typically just one lease. That's just not correct. Did they say that? Yes. Oh, okay. You're totally correct. We get back to the concept of when there is a well that's drilled. And the reason you don't have drilling on every single unit or lease is that it's inefficient. There's unnecessary surface disturbance, and that's not the way you find the resource. So you have a well. Which was my explanation for why you treat extension by drilling differently. Right. But during the primary term. Right. So they found a well that was capable of production under the statute. Then the attention turns to that and developing a plant for that well, not just simply continuing exploration for other reservoirs. The focus is on determining how to develop and who will share in the reservoir that has been found. So is it your position, then, that the status quo, that what we have here, which is one well capable of production, should have been allowed to, if everything had gone according to plan, should have been allowed to tie up all of this land, all of this time, without any further? Well, it's all of this time because there were complications from the lawsuit resulting in suspensions. Wait a minute. You've got that in your footnote in the gray brief. But Pit River One wasn't even filed until 2002. That's correct. And your brief says that BLM should have constricted this plan area in 1996. It should have happened before. Right. In February. So could you just walk me through, since I think your brief does make that concession, I'm going to be pretty unhappy about blaming Pit River for bringing this suit as a reason that the BLM didn't constrict the unit. And I don't think you meant to really imply that. There were problems. That explains, from 2002 on, the problem earlier. How should this have worked? If the government had followed that path, how should this have worked? Well, what should have happened is that from 1989, when the capable well determination was made, then at that point the unit operator should have submitted an initial participating area. BLM would have evaluated it, and the reservoir contours would have been defined. The leases that would share in the participating area would have been defined. All the leases that were outside the participating area would then be put on the five-year clock to commence drilling to find another reservoir. On a one-by-one basis, on an individual basis, lease-by-lease. The unit still existed. I appreciate that. So during the five-year clock period, your time is ticking. During that five-year clock, they would have been entitled to the unitization benefit. And then what? But the unit operator would continue working on behalf of all of them outside the participating area to explore. Five years. Correct. And then what? And then if another well, another reservoir was found that was capable of production, then that would have triggered the process to form a new participating area. But, Counsel, more to the point, if that hadn't been, if another well hadn't been found, then those get excluded? Correct. Then the unit area contracts down to the participating area. So all those leases are outside the unit and have no benefit of the unitization principle, and they're on their own. Then the unit operator is not responsible for them. Each individual lessee has to get an extension and find a resource, or that lease would expire. Thank you very much. Thank both sides for their arguments. The case of Pitt River Tribe is now submitted for decision, and we are in adjournment. There will be, we're scheduled for another set of hearings for another panel at 10 o'clock, but that's going to be delayed by at least some minutes. We're now in adjournment. Thank both sides. All rise. This court for discussion stands adjourned.
judges: Fletcher, Christen, Silver